**Rachel EVANS et al., Plaintiffs,**

**v.**

**James T. LYNN, in his capacity as Secretary of the Department of Housing and Urban Development, et al., Defendants.**

**No. 73 Civ. 3475 (MP).**

United States District Court,
S. D. New York.

May 22, 1974.

Suburban Action Institute, for plaintiff, by Lois D. Thompson, Richard F. Bellman, J. Christopher Jensen, Tarrytown, N.Y.

Paul J. Curran, U. S. Atty. S.D. New York, for defendants Lynn, Green, Monticciolo, Morton, Watt, Dept. of Housing and Urban Development and Dept. of the Interior by V. Pamela Davis, New York City.

Wikler, Gottlieb, Taylor & Howard, for defendants Carroll and Tri-State Regional Planning Commission by Jeremiah T. Spires, New York City.

Golenbock & Barell, for intervenor Town of New Castle by Arthur M. Handler, Andrea Hyde, New York City.

POLLACK, District Judge.

Plaintiffs, low-income minority residents of Westchester County, have moved for a declaration of class action status, Fed.R.Civ.P. 23, and for a preliminary injunction, Rule 65, to restrain two federal agencies [1] from supplying funds under grants that have been approved to the Town of New Castle for the construction of sewer facilities and the clearance of a swamp area for recrea-

---

1. The Department of Housing and Urban Development ("HUD") and the Department of the Interior ("Interior").

tional use. In connection therewith, plaintiffs challenge the Tri-State Regional Planning Commission's tacit approval of the grants in question.

Plaintiffs contend that all three agencies abdicated their responsibilities under the Civil Rights Acts [2] and the regulations promulgated thereunder in granting federal funds to New Castle.

All defendants oppose the motion for class declaration and have cross-moved to dismiss the suit. The Town of New Castle has applied for leave to intervene herein and to support the cross-application for dismissal.

Disbursement of the funds granted has been withheld pending determination of the claims presented herein.

Since it is the decision of the Court that the plaintiffs lack standing to bring this suit the plaintiffs' motions must be denied and the defendants' and the intervenor's motions must be granted and the complaint dismissed for the reasons which follow.

*The History of the Grants.*

In 1969, New Castle requested federal aid from HUD for the installation of a sewer system in Chappaqua, New York, pursuant to 42 U.S.C. § 3102. That section authorized the agency to make matching grants to local communities for the development of, *inter alia*, basic public sewer facilities. Similar federal funds were requested pursuant to 16 U.S.C. § 460*l*–8 from the Department of the Interior, Bureau of Outdoor Recreation ("BOR") in 1972 to aid the development of a public park and recreation area in what is known now as Turner Swamp.[3] Both agencies, after due consideration and investigation into the proposals, agreed to provide the requested funds. Subsequently, the Suburban Action Institute (counsel for plaintiffs herein) filed informal complaints with both agencies protesting the respective grants. These complaints in effect raised the same objections which plaintiffs have now brought before this Court, namely, that the approval of the grants would deny members of racial minorities and low-income persons equal opportunity to benefit from the grants, and were thus violative of federal civil rights laws due to New Castle's exclusionary and discriminatory policies. In both instances, agency counsel replied that the matter had been reviewed and that there was no legal basis for halting the grants.

Sometime after New Castle's applications were filed with them, both HUD and BOR forwarded the applications to the regional planning commission (defendant Tri-State) for comment, pursuant to federal regulations. Tri-State replied to both agencies that it would not review the applications as they were "non-regional" in significance and thus outside its jurisdiction.

Urging that the grants are violative of the "civil rights laws and policies", plaintiffs then brought the instant action for injunctive and other relief to prevent the flow of the federal funds to New Castle.

On the return of the motions before the Court a preliminary discussion with counsel indicated that it would aid any evidentiary hearing that might be required if the government were to file and serve copies of the administrative records of these grants and permit the plaintiffs to take depositions of officials and others involved in the consideration of the grants. At a later date the intervenor also requested an opportunity to examine the plaintiffs. Discovery to both sides was granted accordingly.

The plaintiffs have thus been accorded a wide opportunity to make a factual investigation of the New Castle applications and the civil rights enforcement procedures utilized by the federal de-

---

2. 42 U.S.C. §§ 2000d et seq. and 3601 et seq., popularly known as the Civil Rights Acts of 1964 and 1968.

3. Both Chappaqua and Turner Swamp are sections of New Castle. The sewer project is formally located in the "King-Greeley Sanitary Sewer District".

fendants and the defendants have had an opportunity to elicit the facts concerning the interest of the plaintiffs. The legal issue of standing raised by the motions is now cast in sharp relief against this well-developed factual background.

*The Town of New Castle.*

New Castle is predominantly white and a well-to-do enclave. Almost 90% of New Castle is zoned for single-family, residential development on parcels of more than one acre; the median value of single-family homes in New Castle in 1970 was in excess of $50,000. Median family income in New Castle in 1970 was $22,005 compared with $11,349 in Westchester as a whole. Westchester County's population is approximately ten percent non-white. The Town of New Castle is only 1.3% non-white. New Castle has been involved in a recent, well-publicized skirmish with the New York State Urban Development Corporation. In that contest, New Castle successfully thwarted the state agency's attempt to construct a small 100-unit low-cost housing facility in the town. It is thus clear that New Castle continues to be resistant to attempts to alter its present housing character.

*The Motion of New Castle to Intervene.*

On March 9, 1974—some seven months after the commencement of this action—the Town of New Castle applied for leave to intervene pursuant to Rule 24, Fed.R.Civ.P. Plaintiffs objected on the grounds of untimeliness of the application and because "delay" might be occasioned by an intervention.

■■ Whether or not the motion to intervene was "timely" brought is a question of circumstances, and is not to be judged merely by the calendar. The lack of demonstrable prejudice to the plaintiffs from the allowance of the requested intervention is decisive here on the question of timeliness. *See, e. g.,* McCausland v. Shareholders Management Co., 52 F.R.D. 521 (S.D.N.Y.1971). *See also* Diaz v. Southern Drilling Corp.,

427 F.2d 1118 (5th Cir.), cert. denied sub. nom Trefina v. United States, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed. 115 (1971) (intervention allowed one year after commencement of suit; no showing of prejudice). New Castle has a primary interest in the grants involved herein and reason and equity indicate that its application for leave to intervene should be granted and it is so ordered pursuant to Fed.R.Civ.P. 24(a)(2).

*Standing of Plaintiffs.*

The threshold, and decisive, issue in this case is whether plaintiffs have standing to bring this suit.

■ The law of standing is no mere arcane, procedural punctilio; the requirement that plaintiffs must have standing to sue goes to the very essence of the guarantee that "questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution." Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L. Ed.2d 947 (1968). *See also* O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Consequently, Courts are vigilant in requiring that litigants maintain a personal stake in the outcome of the controversies they present. DeFunis v. Odegaard, —— U.S. ——, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (Brennan, J., dissenting).

■ Justice Frankfurter referred to "standing" as a "complicated specialty of federal jurisdiction." United States ex rel. Chapman v. Federal Power Commission, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L.Ed. 918 (1953). The federal courts have long struggled to define the proper outer limits of this obscure, elusive and amorphous concept.[4] The law is now

4. *See generally* Jaffe, Standing Again, 84 Harv.L.Rev. 633 (1971).

clear that standing exists where plaintiffs can satisfy the two-pronged test that they have suffered—or will suffer—an injury in fact, and that they are at least arguably within the zone of interests protected by the relevant statute. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Warth v. Seldin, 495 F.2d 1187 (2d Cir., 1974).

Preliminarily, the statutes involved herein are not, as defendants contend, the community development grant statutes, 42 U.S.C. § 3102 and 16 U.S.C. § 460l–8. The statutes here involved are the 1964 and 1968 Civil Rights Acts (referred to sometimes as Title VI and Title VIII), and the regulations promulgated thereunder, which are claimed to prohibit federal agencies from granting funds to suburban areas which have discriminatory zoning and land-use regulations. The plaintiffs, undoubtedly as a result of the opportunity to make a factual investigation of the processing of the New Castle applications, have enlarged the charges in their earlier papers and the relief initially sought— they seek a finding from the Court that the existing HUD and Interior procedures fail to conform with the law in respect to community development grant applications; that those agencies should be compelled to adopt meaningful civil rights review procedures; that they have abdicated their responsibilities under the civil rights laws by alleged appalling neglect of the needs of minority and other low-income persons constrained to live in the intolerable environment of America's slums.

This "overview" (so denominated) suggests that plaintiffs in addition to their personal status should be considered as private attorneys general if that is necessary to permit them to assert these claims. The standing of the plaintiffs to raise their points arises, if at all, not under the community development grant statutes but, under the umbrella of the Civil Rights Acts.

The Supreme Court has declared that the Civil Rights Acts evince a congressional intention to define standing as broadly as is permitted by Article III of the Constitution. Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed. 2d 415 (1972). See also Hackett v. McGuire, 445 F.2d 442 (3d Cir. 1971). However, even if plaintiffs are deemed to be within the ambit of the Civil Rights Acts, that by itself does not satisfy the "two-pronged" standing requirement noted above. For it is the existence of an *injury in fact* which is the *sine qua non* of standing; there must be, at base, some threatened or actual injury to the plaintiffs resulting from the putatively illegal action before a federal court may assume jurisdiction. Litigants who seek to vindicate their own value preferences through the judicial process where there is neither injury in fact to plaintiffs nor a personal stake in the outcome of the controversy, viz., an actual and immediate interest, lack standing to sue. O'Shea v. Littleton, *supra*; Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). See also Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

While the Supreme Court has expanded considerably the notion of what constitutes "injury" for purposes of standing, the requirement of injury is still a cardinal requirement, even where statutory issues are raised. *Compare* United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (very slight injury shared by many sufficient for standing) *with* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972) (no injury alleged). *See also* Brookhaven Housing Coalition v. Kunzig, 341 F.Supp. 1026 (E.D.N.Y. 1972). As was noted in *Sierra Club,*

broadening the categories of injury that may be alleged in support of standing is a different matter from

abandoning the requirement that the party seeking review must himself have suffered an injury. 405 U.S. at 738.

*See also* Linda R. S. v. Richard D., *supra*, at 617.[5] The lack of any injury to these plaintiffs precludes the Court from any further inquiry herein.

■ In seeking to erect standing for themselves, plaintiffs would have the complaint read in a vacuum rather than in relation to New Castle and plaintiffs' connection therewith. To be justiciable, their disagreement with the agency policies must, however, be connected to the alleged illegal activity, to wit, the funding of the New Castle projects. Plaintiffs do not, and apparently cannot, allege that they will suffer any injury from the grants that have been made by the agencies. They have not shown that they have suffered or will suffer any injury "aris[ing] out of, or relat[ing] to, the application of the procedures in question." Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). While it is doubtless true that plaintiffs' present alleged ghetto living conditions are a very real and very serious "injury", that "injury" is in no way linked to the particular grants complained of herein. Nor would restraining deliverance of the federal funds in any way alleviate their situation. Furthermore, plaintiffs' status as "potential residents" of New Castle does not create an injury where none exists. Indeed, the recent decision in Warth v. Seldin, *supra*, dealt precisely with the issue of potential residents as injured parties in the context of a frontal attack on the restrictive zoning laws of a small upstate New York town. There, as here, none of the plaintiffs claimed that anyone refused to sell or lease housing to them; there, as here, plaintiffs neither had nor claimed any interest in land within the town or any connection with any plan to construct housing for them within the town. Dismissing the complaint for lack of standing, the Court of Appeals tersely stated that the plaintiffs lacked the necessary "personal stake in the outcome of the controversy". 495 F.2d at 1192. *See also* O'Shea v. Littleton, *supra*; Sierra Club v. Morton, *supra*. The Court continued:

> The essence of their complaint is that the zoning practices of the appellees are unfair. However true that charge may be, absent a showing that appellants themselves have suffered from these practices they lack standing to challenge them. Their dispute with appellees reflects primarily a political disgruntlement. They indicate no benefit which a judgment favorable to them would produce. They allege neither capability nor intent to construct housing for themselves on any land which the court might order rezoned as an element of relief.

Although the complaint in this case is admittedly not aimed directly at overturning zoning laws, as in *Warth*, it is clear that the legality of New Castle's zoning must of necessity be at the core of any ultimate determination of this controversy. To declare the federal policies unlawful, it would have to be established that New Castle's zoning laws result in unconstitutional racial and economic segregation. On their face, at least, the HUD and BOR grants clearly insure that New Castle must not discriminatorily administer the sewer or swamp projects;[6] therefore, plaintiffs'

---

5. "[F]ederal judicial power is to be exercised to strike down legislation . . . only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." Poe v. Ullman, 367 U.S. 497, 504, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989 (1961) (Frankfurter, J.). *See also* D.C. Federation of Civic Associations v. Airis, 275 F.Supp. 533 (D.D.C.1967).

6. The relevant HUD and BOR files indicate that every effort has been made to insure compliance with the Civil Rights Acts in the administration of the funds, as dictated by federal regulations. *See, e. g.*, 24 C.F.R. § 1.4(2)(i). Thus, with respect to the BOR grant, the Town has signed an "Assurance of Compliance" form supplied by Interior to guarantee compliance with Title VI of the Civil Rights Act of 1964; furthermore, the

attack would have to be aimed at New Castle's land-use regulations. And it is precisely this sort of attack that *Warth* declared "potential residents" could not make.[7] Potential residents, as such, can claim at best only a remote, speculative injury, and a speculative injury cannot be made the cornerstone of standing. O'Shea v. Littleton, *supra*. *See also* Gaillot v. Department of Health, Education and Welfare, 464 F.2d 598 (5th Cir. 1972).

■ Plaintiffs' further suggestion that if they do not have standing no one will, while having surface appeal, is similarly wide of the mark, both as a matter of law and fact. For one thing, the mere fact that a qualified plaintiff is not presently in Court in no way qualifies these, or any other, uninjured plaintiffs to litigate the issue posed here. To argue that everyone has standing simply because no one can now be found is a *reductio ad absurdum* that this Court cannot accept. Moreover, plaintiffs' argument ignores a class of plaintiffs that might well have the necessary standing. Thus, for example, were some other, perhaps neighboring, town that had low-income housing and minority concentration to allege that it was denied federal funds in favor of New Castle's grants, it might perhaps be able to challenge the rating system of HUD and BOR which approved such grants. Since plaintiffs' main contention here appears to be that the federal defendants fail to properly

take low-income and minority concentration into account when rating proposed funding projects, such a hypothetical plaintiff would be in a peculiarly appropriate position to complain, for its injury would have a direct nexus to the procedure challenged. *Per contra,* here the plaintiffs can point to no injury they personally have suffered because of the agencies' actions.[8]

■ Plaintiffs attempt as well to satisfy the standing requirement as federal taxpayers under the doctrine of Flast v. Cohen, *supra*. As a preliminary matter, Warth v. Seldin, *supra*, specifically disapproved of "taxpayer" challenges to zoning regulations. Furthermore, *Warth* reiterated the more general pre-*Flast* rule that

> [a]s a general rule the interests of a federal taxpayer in federal expenditures are too "minute and indeterminable . . . fluctuating and uncertain" to provide a basis for standing. Frothingham v. Mellon, 262 U.S. 447, 487, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). 495 F.2d at 1191.

While the agency action complained of herein does indeed directly involve federal funding, there has been no showing by plaintiffs that the challenged action in any way adds to their tax burden. As such, there is no standing as federal taxpayers even assuming *arguendo* that the other strict requirements of *Flast* were to be met. Davis, Administrative Law Treatise (1970 Supp.) § 22.09–7;

General Provisions of the "Land and Water Conservation Fund Project Agreement" declares that "The [grantee] shall not discriminate against any person on the basis of race, color, or national origin in the use of any property of facility acquired or developed pursuant to this agreement", as well as a further assurance of compliance with Title VI and the regulations promulgated thereunder. The HUD agreement incorporates a similar "assurance of Compliance" form both as a separate document and as part of the grant agreement. And HUD's "Project Summary and Approval" form specifically concluded that, after examination, "[t]he proposed facilities will serve the applicant's area of jurisdiction without discrimination against any minority group."

7. Even if the issue of New Castle's zoning were eventually reached, it is at best doubtful whether that zoning would be declared *per se* unconstitutional in light of the Supreme Court's recent holding in Village of Belle Terre v. Boraas, —— U.S. ——, 94 S. Ct. 1536, 39 L.Ed.2d 797 (decided April 1, 1974). *But see* United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (5th Cir. 1974).

8. Plaintiff's reliance for standing on the Administrative Procedure Act, 5 U.S.C. § 500 et seq., is similarly misplaced. That Act in no way expands the concept of standing; the plaintiffs still must show that they are "aggrieved" by the agency action before they can obtain judicial review. 5 U.S.C. § 702.

**334**

Carlsbad Union School District v. Rafferty, 300 F.Supp. 434 (S.D.Cal.1969).

Thus, no matter in what light plaintiffs are viewed, they simply lack the necessary standing to bring this suit. And since the standing requirement is jurisdictional, the Court is constrained to avoid consideration of the merits of the case before it—tempting though that consideration may be. As Justice Blackmun wisely cautioned in his concurrence in O'Shea v. Littleton, *supra*, "[w]hen we arrive at that conclusion [that there is no standing], it follows, it seems to me, that we are precluded from considering any other issue presented for review." *See also* International Longshoremen's and Warehousemen's Union v. Boyd, 347 U.S. 222, 223, 74 S.Ct. 447, 98 L.Ed. 650 (1954) (Frankfurter, J.).

Under all the facts and circumstances, therefore, the plaintiffs' motion for an injunction pursuant to Rule 65, Fed.R. Civ.P. is denied [9] and the motions of the defendants and the intervenor to dismiss for lack of jurisdiction are granted. The complaint is dismissed pursuant to Rule 12(b)(1).

So ordered.

9. Since the complaint is dismissed, there is no need to reach plaintiffs' class action motion.